NORTH LITTLE ROCK WATER COMPANY *v.* WATER WORKS COMMISSION OF LITTLE ROCK.

4-5816 136 S. W. 2 194

Opinion delivered January 29, 1940.

*C. H. Dickey, G. R. Smith, J. F. Loughborough* and *Coleman & Riddick,* for appellants.

*P. A. Lasley,* for appellee.

SMITH, J. The Arkansas Water Company and its predecessors supplied the cities of Little Rock and North Little Rock, and the inhabitants thereof, with water as a waterworks public utility under franchises granted by those cities respectively until 1920, when the franchises were exchanged for indeterminate permits. Prior to 1913 the source of water supply for Little Rock was the Arkansas river, from which stream water was pumped to the company's reservoirs within the city of Little Rock. Deep wells in the city of North Little Rock supplied the water for that city.

Later the Water Company entered into a contract with the Broadway-Main Street Bridge District for a pipe line across a bridge connecting the two cities, and for some years both cities derived their water supply from the Arkansas river, which was first pumped into

PAGE 775]

a reservoir in the city of Little Rock, where the water was treated and settled. Water from this reservoir was carried in pipe lines across the bridge, being metered immediately adjacent to the bridge through a Venturi meter located on the Little Rock side of the river.

In 1935, the city of Little Rock desired to secure another source of water supply, and negotiations with the Water Company to that end were begun. Proceeding under act 131 of the Acts of 1933, as amended by act 96 of the Acts of 1935, the city and the Water Company worked out a plan whereby the city would construct a dam on Alum Fork of Saline River, about forty miles from the city, with a pipe line leading to the existing reservoirs and treatment plant of the Water Company in the city of Little Rock. Under the proposed plan the city agreed to sell water to the Water Company at a price sufficient to retire bonds which the city proposed to issue to construct the dam and the pipe line.

The project was contingent upon receiving aid from the federal government to the extent of about a million dollars, and in anticipation of receiving this aid a written contract was entered into between the city of Little Rock and the Water Company setting forth the terms of their agreement. But approval of this contract by the federal government was denied on the ground that the government had no authority to contribute to a project of that kind, but aid was promised upon condition that the city of Little Rock buy the plant of the Water Company serving the city of Little Rock.

In 1935, the officials of the city of Little Rock negotiated with officials of the Water Company to purchase all of the plant and property of the Water Company serving Little Rock and its vicinity south of the river. The source of supply for North Little Rock was then in the city of Little Rock, and would not need to be purchased by the city of Little Rock, and the Water Company would be required to secure another source of supply for North Little Rock, either from wells, the

river, or impounding reservoirs, any of these methods involving substantial expense.

It was apparent that on the purchase of the Little Rock plant by the city, it would have a surplus beyond its need, and could supply the company with water for distribution in North Little Rock, with only the added expense of pumping and treating the water so long as the water was pumped from the river, and of treating the water when it flowed by gravity, the expense being about 1½ cents per thousand gallons when the water was pumped from the river, and about ½ cent per thousand gallons when it flowed by gravity from the new source of supply.

In these circumstances the officials of Little Rock and the Water Company agreed that the contract of purchase of the Little Rock plant should provide that the city would furnish the Water Company with water for its North Little Rock plant for the price of 5 cents per thousand gallons so long as the water was pumped from the river, and thereafter at 4 cents per thousand gallons when it flowed by gravity from the new source of supply on Alum Creek; and in consideration of that agreement the Water Company made a substantial reduction in the sale price of the Little Rock plant, and waived the severance damages. A contract to that effect was duly signed and approved by an ordinance of the city of Little Rock passed February 17, 1936, in which it was recited that the Water Company would pass all resolutions by its board of directors and stockholders necessary, and the city should pass the necessary ordinances to make the agreement effective on the part of the city to sell water to the company for North Little Rock.

The city passed an ordinance which recited the agreement for the sale of water to the company for North Little Rock, and setting forth the details for meter readings and monthly settlements. The ordinance contained the emergency clause, which recited that the Water Company was an important customer for water to be supplied

by the city, and that the contract was necessary for the financing of the project by the city, and that the financing of the project was necessary to be consummated immediately for the city to receive the promised, federal aid. The contract to purchase the plant embodying the agreement to sell water to the Water Company for North Little Rock was duly approved by the Department of Public Utilities on March 17, 1936.

Following all this, formal deeds and assignments, reciting a consideration of $1 and other considerations, were executed by the Water Company to the city, conveying all of the plant and properties, accounts receivable, agreements with improvement districts, and all other things and matters relating to the property conveyed, and were delivered to the city, and possession of the Little Rock plant was turned over to the city on April 1, 1936, and the indeterminate permit of the Water Company to serve Little Rock was terminated, the order of the Public Utilities Department expressly reciting that its permit to serve the city of North Little Rock and vicinity north of the river was continued in full force and effect.

Since that time, and for about one year, that part of the contract for supplying the company with water at the rate of 5 cents per thousand gallons was performed without interruption. During this time the city was engaged in constructing its dam, and water was pumped from the Arkansas river. When the dam was completed, and water flowed by gravity, it was charged for at the rate of 4 cents per thousand gallons.

The dam and reservoir were made sufficiently large to be ample to serve the city of Little Rock for a long time in the future, and there was every indication that there would be a surplus of water not needed to supply Little Rock, and, unless used, would waste over the dam or remain in the lake or reservoir behind it and this surplus could be supplied under the contract with the Water Company for North Little Rock with only the added expense of treating it, which is ½ cent per thou-

sand gallons, the city thus realizing a profit of 3½ cents per thousand gallons on all water sold to the company for use in North Little Rock.

Under act 215 of the Acts of the 1937 general assembly, p. 795, the city appointed a waterworks commission shortly after March 8, 1937, which has since managed the municipal waterworks plant and collected the charges on the sale of the water to the company for use in North Little Rock.

On March 22, 1939, the waterworks commission filed with the city council of Little Rock a recommendation for the adoption of a schedule of water rates. The Water Company had no notice of this meeting or recommendation. The city council passed an ordinance pursuant to this recommendation, which set forth a schedule of rates for water, the only change in the schedule relating to the rate for consumption of water in excess of 131,400 cubic feet per month (a cubic foot of water is equal to 7½ gallons), which was fixed at 6.75 cents per 100 cubic feet, whereas the prior rate used by the city and the waterworks commission for water in excess of 1,333,300 cubic feet was 3.75 cents per 100 cubic feet. In terms of gallons, the old rate, with "step-up" in the schedule, was equivalent to about 5 cents per thousand gallons, and the new rate about 9½ cents per thousand gallons. The ordinance recited that all ordinances, rate schedule and agreements fixing charges for water, were repealed, set aside and held for naught. The Water Company was the only purchaser of water in excess of 131,400 cubic feet per month.

Following the passage of this ordinance, and prior to April 1, 1939, the waterworks commission notified the Water Company that from and after the passage of the ordinance water would be charged for in accordance with the ordinance, amounting to about 9½ cents per thousand gallons. The ordinance contained provisions for certain discounts upon prompt payment except as to minimum bills, and for a penalty for delinquency in payment.

On March 30, 1939, suit to enjoin the enforcement of the new rates was filed in the federal court, and a temporary restraining order issued, but on June 22nd the case was voluntarily dismissed without prejudice, and on the same day the instant suit was filed in the Pulaski chancery court, and a temporary injunction was granted by that court against the enforcement of the new water rates.

A demurrer was filed, upon the ground that the complaint did not state a cause of action, which was sustained. The Water Company elected to stand on its complaint, the same was dismissed, and from that decree is this appeal.

The application of the waterworks commission for the revision of the water rates, in response to which ordinance No. 5712 was passed by the council of the city of Little Rock, contains a recital as to the operating costs of the waterworks plant, upon consideration of which the council incorporated into the ordinance the finding that "It costs the sum of 11.51c per thousand gallons to concentrate and impound water in Lake Winona (the lake created by the dam), transmit the same to the filtration and treating plants in Little Rock, and the treatment and purification of the same preparatory to turning it into the city distribution system." It was further recited that the contract rate of 4c per thousand gallons to the Water Company is inadequate, unjust and unreasonably low, and does not yield the Little Rock Municipal Water Works sufficient compensation to cover the cost and expenses of supplying said water, and a reasonable depreciation and return upon the property used and useful in supplying the service, and results in a discrimination against the city of Little Rock and its inhabitants.

As has been said, the Water Company was not notified that this report was being prepared, and had been prepared, and was not advised of the intention to pass the ordinance until after its passage.

The ordinance divides the rate payers into six classes, and fixes rates upon the basis of water consumed. In the first class are users of 6,700 cubic feet per month, or less, whose rate was fixed at 30 cents per 100 cubic feet. For the next 6,700 cubic feet per month, or less, the rate was 25 cents per 100 cubic feet. For the next 20,000 cubic feet per month, or any part thereof, a rate of 22 cents. For the next 26,000 cubic feet per month, or any part thereof, 15 cents per 100 cubic feet. For the next 32,000 cubic feet per month, or any part thereof, 12 cents. For the next 40,000 cubic feet per month, or any part thereof, 10 cents. For the excess of any quantity over 131,400 cubic feet per month, a rate of 6.75 cents per 100 cubic feet.

It appears that the original contract between the city of Little Rock and the Water Company was upon the consideration of a cash payment of $3,850,000, and the waiver and relinquishment by the Water Company of any claim for severance damages resulting from the exclusion of the Water Company from its reservoir and existing sources of supply for water which it required in North Little Rock. The complaint alleged that the reduction in the purchase price was made and the severance damages waived in consideration of an agreement to furnish water at the contract prices.

It was alleged that the original contract between the city and the Water Company was performed according to its terms for about three years, when the city passed ordinance No. 5712, hereinabove referred to.

The right to pass the ordinance is asserted by the city under the reserved legislative power delegated to the city by the general assembly of the state to fix rates in a legislative capacity for a municipal plant. Sections 2005-2016, Pope's Digest. If these sections do not confer this power, it would appear to be that the power of fixing rates and of other regulations was non-existent. In other words, if the city does not have that power, no other agency appears to have.

This right is denied by the Water Company, which insists that its contract was for the sale of its Little Rock plant at a reduced price, with a waiver of the severance damages, in consideration of which the city agreed to sell surplus water at an agreed price.

The controlling question in the case appears, therefore, to be whether the contract between the city and the Water Company, approved, as it was, by both the council of the city and the Department of Public Utilities, was a mere contract for the sale of surplus water. If it was this and nothing more, the contract is valid as such, and must be enforced accordingly, and it is beyond the power of the city to change the contract without the consent of the Water Company, the other contracting party.

To sustain its position the appellant Water Company relies upon the case of *McGehee* v. *Williams,* 191 Ark. 643, 87 S. W. 2d 46, in which it was held that a city is authorized to sell its surplus water to inhabitants located without the city limits. In that case the city of Fort Smith constructed a municipal waterworks system, including a reservoir. The water supply was obtained in the vicinity of the town of Alma, and was conveyed in a pipe line which passed near Alma. The town of Alma was engaged in constructing a municipal water system, and required a source of supply. There was no connection between the two proposed systems. Fort Smith had never furnished water to Alma, and was under no obligation to do so. Fort Smith had a surplus of water beyond its own requirements, and it was held that authority existed for the sale of this surplus water as a matter of contract, upon such terms as might be agreed upon, for the reason that the reserved legislative power to fix and regulate rates does not extend to such contracts or to that service.

Here, the Water Company was engaged, as a public utility, in supplying water to both Little Rock and North Little Rock. The plant was for that purpose, and a common source of supply was used for both cities.

Unlike the case of *McGehee* v. *Williams, supra,* the question here presented appears, not to be whether Little Rock may furnish water to North Little Rock, which had not been previously furnished, as surplus water, not required for its own purposes, but, rather, whether North Little Rock may be deprived of a utility service which it had when the contract was made between the city of Little Rock and the Water Company.

Now, it is alleged that Little Rock did not purchase the entire plant owned by the Water Company. It purchased only so much thereof as lay and was situated within the city of Little Rock; but, so far as North Little Rock is concerned, it had as well have done so, and, in effect, has done so, as North Little Rock has no other source of supply, and will have none until another source of supply may be provided. The city of Little Rock did supply water for North Little Rock under the contract until the waterworks commission was created, and thereafter the commission supplied water to the Water Company for resale and distribution at the rates set forth in the contract until ordinance No. 5712 became effective. If, therefore, the contract between the city of Little Rock and the Water Company is merely one for the sale of surplus water, it must be enforced according to its terms. If, however, the contract calls for a public utility service, supplied and furnished within the governmental or legislative jurisdiction of the council, the rates fixed in the contract were subject to change and revision by the council of the city of Little Rock in the reasonable exercise of that jurisdiction.

Appellant concedes, as it must do, that it is settled beyond excuse for extensive citation of authority that a public utility may not abandon any part of its property devoted to public service without the consent of the state, or transfer its property to someone else and be rid of its duty to serve the public. This rule of the common law is reaffirmed in act 324 of the Acts of 1935, which is "An act providing for the better regulation of certain public utilities in the state of Arkansas, and

for other purposes." It is provided in § 57 of this act that "With the consent of the Department (of Public Utilities), but not otherwise, . . ., any public utility may sell, acquire, lease, or rent any public utility plant or property constituting an operating unit or system."

Appellant also concedes the principle that when a public utility sells its public utility property, the purchaser assumes the duty of carrying on the public utility service to which the property had been dedicated. The numerous cases cited in the briefs of opposing counsel sustain this concession, among them being our own cases of *Railroad Commission of Arkansas* v. *Saline River Railroad Co.*, 119 Ark. 239, 177 S. W. 896, and *Freeo Valley Railway Co.* v. *Hodges,* 105 Ark. 314, 151 S. W. 281.

It is conceded by appellant that when a public service corporation sells and transfers its property serving a certain community, the transferee succeeds to the obligations of the transferor serving the community, and that this rule applies when a municipality, with power to do so, purchases a distribution system serving a certain community, the purchasing municipality would be compelled to continue the service. But it is insisted that this principle has no application to the facts of this case, for the reason that the Little Rock municipal waterworks system was authorized only to buy so much of the Water Company's plant as was situated in Little Rock and to serve only that city and its vicinity south of the river then being served by that Water Company in that territory.

We think, however, that the principle does apply, for the reason that Little Rock acquired an essential part of the system devoted to furnishing water to North Little Rock, and without which the latter city would be without water supply until another system or source of supply could be procured. The theory of the law is that a city may not be deprived of an essential utility, such as water, through the action of the utility furnishing that service by selling its plant, or an essential portion

thereof, without which the service cannot be furnished; and if it does so, the purchaser or succeeding utility company succeeds to and has imposed upon it the obligation of continuing the service.

It is obvious from the allegations of the complaint itself that North Little Rock has been deprived of its source of water supply, and will continue to be until another source has been obtained, unless the Little Rock Municipal Waterworks Commission is under the obligation to furnish that service. It is true, of course, that Little Rock purchased only so much of the original plant which supplied both cities as lay within its own city limits; but it is true also that the part purchased is essential to service in North Little Rock, and when this purchase was made Little Rock assumed the duty and obligation to continue the service in which the vendor utility company was engaged when it sold a part of its water system. The arrangement for furnishing water to the North Little Rock system was not changed when the city of Little Rock acquired the property of the Water Company south of the river. There was a change only in the source of supply. The entire original plant had been devoted to serving water to both cities, and they were alike interested in the continuance of that service.

It was said by the Supreme Court of the United States in the case of *Munn* v. *Illinois*, 94 U. S. 113, 24 L. Ed. 77, that "When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control."

The entire original plant was devoted to the public service of furnishing both cities with water, and North Little Rock may not be deprived of that service through the action of the Water Company in selling a portion

of its plant without which portion the service to North Little Rock could not be continued. A well considered case which supports this principle is that of *City of South Pasadena* v. *Pasadena Land & Water Co.*, 152 Cal. 579, 93 Pac. 490; and our own cases of *Arkansas-Missouri Power Co.* v. *Brown*, 176 Ark. 774, 4 S. W. 2d 15, 58 A. L. R. 534, applied this principle. See, also, *Salisbury & Southern Ry. Co.* v. *Southern Power Co.*, 179 N. C. 18, 101 S. E. 593, 12 A. L. R. 304; *People's Natural Gas Co.* v. *Public Service Commission,* 279 Pa. 252, 123 Atl. 799.

In 67 C. J., title "Waters," § 633, p. 1158, it is said: "So, in general, a municipal corporation which purchases the assets and franchise of a water company acquires the rights and privileges of, and has no greater rights and powers than, such company; it assumes the responsibility of, and is subject to the same obligations as, such company."

Now, the complaint alleges that the Water Company is furnishing North Little Rock with water in abundant supply, and that it is doing so at less cost than the city of Little Rock proposes, under ordinance No. 5712, to charge for the same service, and that the Water Company is doing this under its contract with the city of Little Rock. But, unless, that contract is merely one for the sale of surplus water—and we hold that it is not—then it is apparent that a preferential and discriminating rate is being given to the Water Company, and this may not be done if the contract is not a mere sale of surplus water.

The law forbids a utility operating as such from discriminating between its customers. It must furnish its service to all alike, upon identical terms. This proposition is not disputed by either of the parties to this litigation, and no citation of authority is required to support it.

Now, it is alleged that in consideration of the rate made it, the Water Company reduced its sale price and waived its claim for severance damages. But such con-

tracts for discriminating rates are unenforceable. Our own case of *Bryant Lbr. Co.* v. *Fourche River Lbr. Co.*, 124 Ark. 313, 187 S. W. 455, definitely settles that question. There a timber owner granted a right-of-way for .a railroad over its timber lands in consideration of a preferential rate for hauling its timber by the railroad as a common carrier. The contract for this preferential rate was held void as being contrary to public policy, the legal principle applied being that a carrier must render service without discrimination as to rates.

The contract for this preferential rate is void as being contrary to public policy, for the reason that there may be no discrimination as to the rates charged for its service.

In the case of *Arkansas Natural Gas Co.* v. *Norton Co.*, 165 Ark. 172, 263 S. W. 775, it was said that a corporation supplying natural gas to consumers cannot be considered as a public utility with respect to certain classes of consumers and a private corporation as to certain others; and that principle must be applied here, unless, indeed, the contract between Little Rock and the Water Company is merely one for the sale of surplus water; and, as has been said, it is not a contract of that character.

In the annotation to the case of *American Aniline Products* v. *City of Lock Haven*, 50 A. L. R. 121, 288 Pa. 420, 135 Atl. 726, many cases are cited holding that discriminating rates may not be granted by a public utility.

The purpose and effect of ordinance No. 5712 was to terminate a discrimination which, from the allegations of the complaint, appears to exist in favor of the Water Company, and to place all users of water on the same basis by making the rates dependent upon quantity of water used.

That the operation and maintenance of the water plant by Little Rock was a governmental function, and not a proprietary activity, was the point expressly de-

cided in the case of *Little Rock* v. *Holland,* 184 Ark. 381, 42 S. W. 2d 383, and the case of *Browne* v. *Bentonville,* 94 Ark. 80, 126 S. W. 93, is to the same effect. If the city is now so acting, then its action in making the contract was in that capacity, since it was executed in contemplation of the performance of a governmental function. *Clear Creek Oil & Gas Co.* v. *Fort Smith Spelter Co.,* 148 Ark. 260, 230 S. W. 897. We think the right of the city of Little Rock to exercise this governmental function was not destroyed by the contract which this suit seeks to enforce.

In the case of *City of Lamar* v. *Town of Wiley,* 80 Colo. 18, 248 Pac. 1009, it was said by the Supreme Court of Colorado: "Since the public utility statute, conferring power of fixing rates for electricity on the Public Utilities Commission, was to be read into contract between private corporations and town fixing rate for electricity, after sale of the utility to city, the contract did not prevent the commission from changing the rate."

Opposing counsel discuss at great length and cite numerous authorities upon the question whether the service rendered by the waterworks commission is performed within the municipality of Little Rock. We think it is. The water is delivered and measured at the water meter which the complaint alleges is located within the corporate limits of the city of Little Rock, and we think the fact is immaterial that the meter is located near the city's boundary, and is not controlling. We think there is no difference between this location and one in the heart of the city. The fact alleged in the complaint to be true is that all the water furnished the Water Company is delivered through a meter located in the city of Little Rock.

The first paragraph of § 2016, Pope's Digest, reads as follows: "The jurisdiction of the municipal council or city commission of any municipality shall extend to and include all matters pertaining to the regulation and operation within the limits of any such municipality of any street railroad, telephone company, gas company

furnishing gas for domestic or industrial purposes, pipe line company for transportation, distribution or sale of oil, gas or water, electrical company, water company, hydro-electric company or other company, operating a public utility or furnishing public service within such municipality.''

We think the grant to the city of the right to regulate private utilities contains no restriction upon the right of the city to regulate the rates of a utility operated by itself. In the case of *Shirk* v. *City of Lancaster,* 313 Pa. 158, 169 Atl. 557, the Supreme Court of Pennsylvania said: ''This power of regulation and control (of public utility rates) is exclusively a legislative matter. Where a state constitutes a commission with general powers of regulation over utilities, it includes all such bodies, municipal or otherwise, unless there is definite classification and exemption therefrom.''

Many questions are discussed by opposing counsel, who have supplied us with exhaustive briefs indicating great research, and in one of the briefs of counsel for appellant it is stated that ''This appeal presents one question that is decisive of the whole case, . . . and that is whether or not the contract between Little Rock and the Arkansas Water Company was a contract for the sale of surplus water.'' We concur in this view that that is the controlling question in the case, and will not further protract this opinion, as we think what we have said is decisive of that question.

The decree of the court below will be affirmed, and it is so ordered.

GRIFFIN SMITH, C. J., dissents; BAKER, J., concurs.

The Chief Justice thinks the contract was one for the sale of surplus water, and that it is valid as long as there *is* a surplus. The period during which such surplus will exist is a question of fact, dependent upon the requirements of Little Rock.